Eric I. Abraham
William P. Murtha
**HILL WALLACK LLP**
21 Roszel Road
Princeton, NJ 08543
Telephone:  (609) 924-0808
Facsimile:  (609) 452-1888
eabraham@hillwallack.com
wmurtha@hillwallack.com

Douglas R. Weider
**Greenberg Traurig LLP**
500 Campus Drive
Suite 400
Florham Park, NJ  07932
(973) 360-7900
weiderd@gtlaw.com

*Attorneys for Defendants Annora
Pharma Private Limited, Grace
Consulting Services, Inc., Hetero Labs
Limited, and Hetero USA, Inc.*

*Attorneys for Defendants
Teva Pharmaceuticals, Inc., and Teva
Pharmaceuticals USA, Inc*

James S. Richter
**MIDLIGE RICHTER, LLC**
645 Martinsville Road
Basking Ridge, New Jersey 07920
(908) 626-0622
Email: jrichter@midlige-richter.com

*Attorneys for Defendants Lupin Limited
and Lupin Pharmaceuticals, Inc*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CATALYST PHARMACEUTICALS, INC. and SERB SA,<br><br>*Plaintiffs*,<br><br>v.<br><br>TEVA PHARMACEUTICALS, INC. and TEVA PHARMACEUTICALS USA, INC.,<br><br>*Defendants*. | C.A. No. 2:23-cv-01190-MEF-JRA |

i

| | |
|---|---|
| CATALYST PHARMACEUTICALS, INC. and SERB SA,<br><br>*Plaintiffs*,<br><br>v.<br><br>ANNORA PHARMA PRIVATE LIMITED, GRACE CONSULTING SERVICES, INC., HETERO LABS LIMITED, and HETERO USA, INC.,<br><br>*Defendants*. | C.A. No. 2:23-cv-01194-MEF-JRA |
| CATALYST PHARMACEUTICALS, INC. and SERB SA,<br><br>*Plaintiffs*,<br><br>v.<br><br>LUPIN LTD. and LUPIN PHARMACEUTICALS, INC.,<br><br>*Defendants*. | C.A. No. 2:23-cv-01197-MEF-JRA |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................ iii

TABLE OF AUTHORITIES ................................................................................. v

TABLE OF EXHIBITS  ATTACHED TO DECLARATION OF ALISON KING ............................................................................................................... vii

I.    INTRODUCTION ........................................................................................ 1

II.   BACKGROUND ......................................................................................... 3

   A.  Patents-in-Suit & Priority Dates ........................................................... 4

     1.  '088 Patent .......................................................................................... 4

     2.  Method of Treatment Patents ............................................................ 5

   B.  Person of Ordinary Skill ........................................................................ 6

     1.  '088 Patent .......................................................................................... 6

     2.  Method of Treatment Patents ............................................................ 7

   C.  TECHNICAL BACKGROUND .............................................................. 8

     1.  Technical Concepts Related to the '088 Patent .............................. 8

     2.  Technical Concepts related to Method of Treatment Patents ..................... 10

III.  LEGAL STANDARDS ............................................................................. 11

IV.   ARGUMENT .............................................................................................. 13

   A.  All asserted claims of the '088 patent are indefinite and invalid. ................ 13

     1.  "Solvate" .............................................................................................. 14

       a.    The term "solvate," which appears in each asserted claim of the '088 patent, is indefinite ............................................................... 14

       b.    Plaintiffs' proposed construction does not cure the indefiniteness of the term "solvate" and is itself indefinite. ................................. 18

     2.  "Complex" ............................................................................................ 19

       a.    The term "complex," which appears in each asserted claim of the '088 patent, is indefinite ............................................................... 19

       b.    Plaintiffs' proposed construction does not cure the indefiniteness of "complex" and is itself indefinite .............................................. 23

   B.  All asserted claims of the Method of Treatment Patents are invalid for indefiniteness under 35 U.S.C. § 112. ........................................................ 25

1.  Each asserted claim of the Method of Treatment Patents is rendered indefinite by a term that refers to a patient being a "slow acetylator" or having "slow alleles" or "fast alleles." ....................................................................25

    a.    Different testing methods yield different acetylation status results and the patent does not specify which method to use. .........................................26

        i.  Several methods exist for assessing one's acetylation status, each potentially yielding different results. ........................................................28

        ii.    The patents do not suggest using one method and substrate in particular....................................................................................................31

    b.    "Slow" and "fast" are terms of degree that are not adequately defined in the specification .........................................................................................33

2.  Plaintiffs' proposed constructions do not cure the indefiniteness of the terms and are themselves indefinite.................................................................36

V.  CONCLUSION .................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
 239 F.3d 1343 (Fed. Cir. 2001) ...........................................................36

*Bell Atl. Network Servs. v. Covad Commc'ns Grp.*,
 262 F.3d 1258 (Fed. Cir. 2001) ...........................................................17

*Cipher Pharmaceuticals Inc. v. Actavis Laboratories FL, Inc.*,
 99 F. Supp. 3d 508 (D.N.J. 2015) ........................................................24

*Dasso Int'l, Inc. v. Moso N. Am., Inc.*,
 2023 WL 5349374 (D. Del. Aug. 21, 2023) .........................................13

*DDR Holdings, LLC v. Hotels.com, L.P.*,
 773 F.3d 1245 (Fed. Cir. 2014) ...........................................................12

*Dow Chem. Co. v. Nova Chems. Corp.*,
 803 F.3d 620 (Fed. Cir. 2015) ........................................................13, 27

*Fresenius Kabi USA, LLC v. Fera Pharms., LLC*,
 2016 WL 5109142 (D.N.J. Sep. 20, 2016) ...........................................12

*GE Lighting Solutions, LLC v. Light of Am., Inc.*,
 663 F. App'x 938 (Fed. Cir. 2016) ....................................9, 33, 35, 36

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
 732 F.3d 1376 (Fed. Cir. 2013) ......................................................13, 25

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
 256 F.3d 1323 (Fed. Cir. 2001) ......................................................11, 12

*Interval Licensing LLC v. AOL, Inc.*,
 766 F.3d 1364 (Fed. Cir. 2014) ..................................................12, 13, 34

*IQASR LLC v. Wendt Corp.*,
 825 F. App'x 900 (Fed. Cir. 2020) ..................................................18, 38

*Laitram Corp. v. NEC Corp.*,
    163 F.3d 1342 (Fed.Cir.1998) ...............................................................38

*Nautilus, Inc. v. Biosig Instruments*, *Inc.*,
    572 U.S. 898 (2014)...............................................................3, 12, 29

*Pacific Coast Building Prods., Inc. v. CertainTeed Gypsum, Inc.*,
    816 F. App'x 454 (Fed. Cir. 2020) ...................................................27

*Saso Golf, Inc. v. Nike, Inc.*,
    843 F. App'x 291 (Fed. Cir. 2021) ........................................26, 28, 31

*TVnGO Ltd. v. LG Elecs., Inc.*,
    No. CV1810238RMBKMW, 2020 WL 1899781 (D.N.J. Apr. 17,
    2020), *aff'd sub nom. TvnGO Ltd. (BVI) v. LG Elecs. Inc.*, 861 F.
    App'x 453 (Fed. Cir. 2021) ...............................................................16

**Statutes**

35 U.S.C. § 112...............................................................12, 27

# TABLE OF EXHIBITS
## ATTACHED TO DECLARATION OF ALISON KING

| Exhibit No. | Title | Bates Number | Shorthand Title |
|---|---|---|---|
| 1. | U.S. Patent No. 10,626,088 | CATA_FIRD-1985361 | The '088 patent |
| 2. | U.S. Patent No. 11,060,128 | CATA_FIRD-1985383 | The '128A patent |
| 3. | U.S. Patent No. 11,268,128 | CATA_FIRD-1985469 | The '128B patent |
| 4. | U.S. Patent No. 11,274,331 | CATA_FIRD-1985555 | The '331 patent |
| 5. | U.S. Patent No. 11,274,332 | CATA_FIRD-1985641 | The '332 patent |
| 6. | Christopher Morris, Academic Press Dictionary of Science and Technology, "solute" (1992) | CATA_FIRD-1985727 | Morris 1992-solute |
| 7. | Principles of Chemistry, Michael Munowitz (2000) | CATA_FIRD-1985731 | Munowitz |
| 8. | Thomas, Gareth. Medicinal Chemistry: An Introduction. (Wiley, 2d. ed., 2007) | DEF-AMI-0000448 | Thomas |
| 9. | Sheetal Shewale et al., *Pharmaceutical Cocrystals: Design, Development, and Characterization*, AM. J. PHARMTECH RES., 1, 2 (2015) | DEF-AMI-0000401 | Shewale |
| 10. | Mahata, G.; Dey, S.; Chanda, J. Crystal Engineering: A Powerful Tool towards Designing Pharmaceutical Solids with Desirable Physicochemical | DEF-AMI-0000392 | Mahata 2014 |

| | Properties. *American Journal of Drug Discovery* (2014) | | |
|---|---|---|---|
| 11. | Pande et al., "Acetylator status, drug metabolism and disease," *The National Medical Journal of India*, 16(1) (2003) | DEF-AMI-0000189 | Pande 2003 |
| 12. | Sabbagh et al., "Worldwide distribution of NAT2 diversity: Implications for *NAT2* evolutionary history," *BMC Genetics*, 9:1-14 (2008) | DEF-AMI-0000212 | Sabbagh 2008 |
| 13. | Walraven et al., "Structure/Function Evaluations of Single Nucleotide Polymorphisms in human N-Acetyltransferase 2," *Current Drug Metabolism*, 9:471-486 (2008) | DEF-AMI-0000246 | Walraven 2008 |
| 14. | Bolt et al., "Re-investigation of the concordance of human NAT2 phenotypes and genotypes," *Arch Toxicol*, 79:196-200 (2005) | DEF-AMI-0000280 | **Bolt 2005** |
| 15. | Garcia-Martin, E., "Interethnic and Intraethnic Variability of NAT2 Single Nucleotide Polymorphisms," *Current Drug Metabolism*, 9:487-494 (2008) | DEF-AMI-0000106 | Garcia-Martin 2008 |
| 16. | McDonagh et al., "PharmGKB summary: very important pharmacogene information for N-acetyltransferase 2," *Pharmacogenetics and Genomics*, 24:408-425 (2014) | DEF-AMI-0000518 | McDonagh 2014 |
| 17. | Fukunaga et al., "Functional Characterization of the Effects of N-acetyltransferase 2 Alleles on N-acetylation of Eight Drugs and Worldwide Distribution of Substrate-Specific Diversity," | DEF-AMI-0000501 | Fukunaga 2021 |

| | *Frontiers in Genetics*, 12:652704 (2021) | | |
|---|---|---|---|
| 18. | Jetter et al., "Phenotyping of N-acetyltransferase type 2 by caffeine from uncontrolled dietary exposure," *Eur J Clin Pharmacol*, 60:17-21 (2004) | DEF-AMI-0000295 | Jetter 2004 |
| 19. | Chen et al., "N-acetyltransferase 2 slow acetylator genotype associated with adverse effects of sulfasalazine in the treatment of inflammatory bowel disease," *Can J Gastroenterol*, 21(3):155-158 (2007) | DEF-AMI-0000048 | Chen 2007 |
| 20. | Christopher Morris, Academic Press Dictionary of Science and Technology, "complex" (1992) | DEF-AMI-0000566-568 | Morris 1992-complex |

## I.    INTRODUCTION

Defendants Teva Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc. (collectively, the "Teva Defendants"), Annora Pharma Private Limited, Grace Consulting Services, Inc., Hetero Labs Limited, and Hetero USA, Inc. (collectively, the "Hetero Defendants"), and Lupin Ltd. and Lupin Pharmaceuticals, Inc. (collectively, the "Lupin Defendants") (altogether, "Defendants") submit this brief to support their proposed claim constructions for the disputed claim terms.[1]

This case involves patents relating to Plaintiffs' drug product, Firdapse®, which contains the active ingredient amifampridine.  Notably, none of the asserted patents cover the amifampridine compound.  Instead, the '088 patent claims an impurity of amifampridine (a "dimer") that has no utility and is undesired in amifampridine drug products.  The Method of Treatment Patents cover methods of treating Lambert-Eaton myasthenic syndrome ("LEMS") in certain patients who have a specified "acetylation status" (i.e., the speed at which a drug is metabolized and removed from the body) with amifampridine.  In essence, the method involves giving a certain dose depending on whether a patient is a "fast" or "slow" acetylator.

---

[1] Plaintiffs are asserting six patents against the defendants in this case, the following five of which are at issue for purposes of claim construction: U.S. Patent No. 10,626,088 ("the '088 patent"); and all claims from the "Method of Treatment Patents," including U.S. Patent Nos. 11,060,128 ("the '128A patent"), 11,268,128 ("the '128B patent"), 11,274,331 ("the '331 patent"), and 11,274,332 ("the '332 patent"). The sixth patent, U.S. Patent No. 10,793,893, also relates to a method of treatment, but is not at issue for purposes of claim construction.

The disputed claim terms and proposed constructions are disclosed in Exhibit A to the Joint Claim Construction and Prehearing Statement.  D.I. 58.[2]  Defendants do not believe construction is necessary (and, thus, the Court should defer its decision at this stage, *see* D.I. 52), but rather contend that each disputed claim term is facially ambiguous and should be found indefinite.  For example, the '088 patent claims cover the "salt," "solvate," or "complex" form of the dimer impurity, but the scope of what "solvate" or "complex" includes is woefully unclear.  Indeed, the claims themselves are inconsistent on what qualifies as one or the other.  For example, the patent refers to a monomethanolate as a solvate in some claims and as a complex in others, yet the terms have very different meanings.

The remaining patents at issue for claim construction, the Method of Treatment Patents, require a person having ordinary skill in the art ("POSA") to decide whether a patient is a "slow acetylator" or "fast acetylator" (or has fast or slow alleles).  The patents, however, do not specify how a POSA should make this determination.  Should a POSA use an enzymatic assay?  Or should a POSA use genotyping?  If they use an enzymatic assay, what substrate should be used?  Depending on how a POSA answers those questions and others, different results can ensue.  A patient can be deemed a slow acetylator during an enzymatic assay using certain substrates, but deemed an intermediate or fast acetylator during an enzymatic

---

[2] All D.I. citations are ECF docket nos. of C.A. No. 2:23-cv-01190.

assay using other substrates.  Moreover, "fast" and "slow" are terms of degree, and the patents fail to provide information required for a POSA to determine whether someone qualifies as "fast" or "slow" after yielding test results.

Thus, for each of the reasons set forth below, the asserted claims of the '088 patent and the Method of Treatment Patents, "read in light of the specification . . . fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments*, *Inc.*, 572 U.S. 898, 901 (2014).

## II.    BACKGROUND

This case involves patents listed in the Food and Drug Administration's Orange Book as relating to Plaintiffs' drug product, Firdapse®.   The active ingredient in Firdapse® is amifampridine.  As acknowledged by the '088 patent, amifampridine, also referred to as 3,4-diaminopyridine (or "3,4-DAP"), was known in the art before the patents at issue here were filed.  '088 patent at 1:19–35.  For this reason, the asserted '088 "compound" patent does not (and could not) cover the amifampridine compound itself.  Instead, the '088 patent covers a 3,4-diaminopyrine *dimer*, which is an undesired impurity that can form during degradation of amifampridine.  '088 patent at 3:50–59.  The '088 patent does not claim methods of detecting the dimer or methods of removing the dimer, but instead claims the dimer as the invention itself.  *See id.* at Claims 1–7.  Again, the dimer is an impurity having no utility as a pharmaceutical compound.

Moreover, as the Method of Treatment Patents acknowledge, prior to the filing of those patents, it was already known that "3,4-diaminopyridine can be used for the treatment of myasthenia gravis and myasthenic syndromes (including [LEMS] . . .) because it improves neuromuscular transmission by increasing the entry of cellular calcium, which promotes the release of acetylcholine in the nerve endings." '128A patent at 1:25–32. As discussed below (*infra* § II.C.2), prior to the filing of these patents, it was also known that different individuals metabolize different drugs at different rates, and that these differences must be taken into account when dosing the drug. Nonetheless, the Method of Treatment Patents cover methods of treating LEMS in certain patients who have a specified "acetylation status" (i.e., the speed at which a drug is metabolized and removed from a patient's body) with a known dose of amifampridine.

### A.    Patents-in-Suit & Priority Dates

#### 1.    '088 Patent

The '088 patent relates to a 3,4-Diaminopyridine dimer (or impurity of amifampridine) and has an earliest potential priority date of June 10, 2016.[3] Plaintiffs have asserted claims 1–7 of the '088 patent against Defendants, despite knowing that Defendants' products are designed to avoid and exclude the claimed

---

[3] Defendants do not concede that the '088 patent has a proper priority claim to any earlier-filed application, but for purposes of this dispute, Defendants have used the earliest potential date.

impurity.  However, each of these claims directly or indirectly uses the indefinite terms "solvate" and "complex."  Independent claim 1 is shown below:

> 1. A 3,4-Diaminopyridine dimer that is



> or a tautomer thereof;
>
> in the form of a salt, **solvate**, or **complex**, or a combination thereof.

### 2.    Method of Treatment Patents

The Method of Treatment Patents all belong to the same patent family and have an earliest potential filing date of June 30, 2011.[4]  Plaintiffs have asserted each claim of the Method of Treatment Patents against one or more Defendant.  Each asserted claim relates to a method of treating a human patient with amifampridine.  Notable to this dispute, each claim has a limitation regarding a patient's "NAT2" acetylator status (i.e., a patient's ability to metabolize a drug once it is in the body).  An exemplary independent claim (claim 1 of the '128A Patent) is below:

> 1. A method of treating a human patient diagnosed with Lambert-Eaton myasthenic syndrome (LEMS) in need of treatment thereof comprising administering a total daily dose

---

[4] Defendants do not concede that the Method of Treatment Patents have a proper priority claim to any earlier-filed application, but for purposes of this dispute, Defendants have used the earliest potential date.

of about 7.5 mg to about 40 mg of 3,4-diaminopyridine (3,4-DAP), or an equivalent amount of a pharmaceutically acceptable salt thereof, to a human patient who is a N-acetyl transferase 2 (NAT2) slow acetylator, wherein the total daily dose is optionally provided as a series of divided doses.

**B.    Person of Ordinary Skill**

**1.    '088 Patent**

A POSA with respect to the '088 patent as of the relevant time should be defined as: a scientist who has a Ph.D. in a field such as chemistry, biochemistry, medicinal chemistry, organic chemistry, analytical chemistry, pharmaceutical chemistry, pharmaceutics, or the like.  Alternatively, the POSA would have an M.S. or Bachelor's Degree and several years of experience in the research, development, and characterization of a pharmaceutical compound or an organic compound. Generally, a POSA requires greater experience in the respective field the lower the level of degree they have earned, and vice versa. Further, the POSA may have access to and would consult with a collaborative team of ordinarily skilled artisans, including a medical doctor, Ph.D., or lesser degree with similar levels of training and experience in related areas of research and development of pharmaceutical compounds, pharmaceutical formulation, pharmacology, pharmacokinetics, medicine, analytical characterization and development, and the like.

Plaintiffs have proposed a slightly different definition of a POSA.  While Defendants maintain that their definition is more appropriate, the indefiniteness analysis and conclusion is the same under either definition.

### 2.    Method of Treatment Patents

A POSA with respect to the Method of Treatment Patents as of the relevant time should be defined as: a medical doctor who specializes in the treatment of autoimmune diseases who, if needed, may have access to and could consult with a scientist who has a Ph.D. in a field such as chemistry, biochemistry, medicinal chemistry, organic chemistry, pharmaceutical chemistry, drug metabolism, clinical pharmacology, human genetics, and/or pharmaceutics, or the like.  The POSA could also be a scientist who has a Ph.D., Master's Degree, or Bachelor's Degree in a field such as chemistry, biochemistry, medicinal chemistry, organic chemistry, pharmaceutical chemistry, drug metabolism, clinical pharmacology, human genetics, and/or pharmaceutics, or the like, with several years of experience in the research, development or formulation of pharmaceutical compounds, who, if needed, may have access to and could consult with a medical doctor who specializes in the treatment of autoimmune diseases. Generally, a POSA requires greater experience in the respective field the lower the level of degree they have earned, and vice versa. A POSA may consult with others as part of a team having the foregoing training and experience, plus similar levels of training and experience in a related

area(s) of research and development of pharmaceutical compounds, such as pharmaceutical formulation, pharmacology, pharmacokinetics, medicine, preclinical and clinical research, computational methodology, analytical characterization and development, drug metabolism, clinical pharmacology, human genetics, and the like.

Plaintiffs have proposed a slightly different definition of a POSA. While Defendants maintain that their definition is more appropriate, the indefiniteness analysis and conclusion is the same under either definition.

### C.    TECHNICAL BACKGROUND

#### 1.    Technical Concepts Related to the '088 Patent

The asserted claims of the '088 patent claim as their invention the undesirable dimer impurity of amifampridine. In doing so, the patent uses certain chemical terms that are commonly used in the chemical and pharmaceutical fields. As explained by Defendants' expert, Dr. Salvatore Lepore, an accomplished professor and researcher in the fields of organic and medicinal chemistry, the patent uses those terms in ways that contradict how an ordinarily skilled scientist would understand them. To start with the basics, a POSA would have understood the following terms based on scientific knowledge known at the time the application for the '088 patent was filed.

**Solvates:** As of the priority date, a POSA would have understood solvates, in the context of medicinal chemistry, to be a crystalline compound associated with one or a small, fixed number of solvent molecules incorporated into the crystal structure.

Declaration of S. Lepore filed contemporaneously ("Lepore Decl.") at ¶ 30.  A POSA would understand that the crystalline solid (for example, a drug substance and its salt forms) combines with a solvent in various configurations (e.g., as a co-crystal).  *Id.* A subset of the term "solvate" is the narrower term "hydrate."  *Id.* at ¶ 31.  A hydrate is a solvate that has water molecules in its crystal structure.  *Id.*

**Solutions:** As of the priority date, a POSA would have also understood that a "solute" is a substance that is dissolved in a "solvent," together forming a "solution." *Id.* at ¶ 33; *see also* Ex. 6 (Morris 2012-a) at 2033.  Thus, the solute is the part of a solution that is uniformly dispersed in a solvent.  Lepore Decl. at ¶ 33.

**Complexes:** A POSA would have also understood the unmodified term "complex" to mean a group of molecules that are held together through bonding with a metal atom.  *Id.* at ¶ 35.  This definition is well supported by the prior art, which is replete with references defining complexes in this way.  *Id.* at ¶¶ 35–36; *see also* Ex. 20 (Morris 2012-b) at 483.  A POSA would have understood that this well-known definition applies unless "complex" is paired with a modifying term, which gives additional context and meaning, for example "molecular complex" or "enzyme-substrate complex."  Lepore Decl. at ¶¶ 37–38; *see also* Ex. 7 (Munowitz) at A116.  These modified terms have their own definitions that differ from the primary definition of "complex."  Lepore Decl. at ¶¶ 37–50.

### 2.    Technical Concepts related to Method of Treatment Patents

With regard to the Method of Treatment Patents, Defendants' second expert—Dr. Samuel Pleasure, M.D., Ph.D., a renowned expert in neurology and autoimmune disorders and a professor and clinician at University of California San Francisco—explains that as of 2011, it was known that several drugs are metabolized in the liver by a reaction referred to as acetylation, which is mediated by N-acetyltransferase isoenzymes NAT1 and NAT2.  Declaration of S. Pleasure filed contemporaneously ("Pleasure Decl.") at ¶ 28; *see also* Ex. 11 (Pande 2003) at 24.

It was also known that different individuals have considerable variability in NAT1 and NAT2 activity levels due to genetic polymorphism (i.e., differences in DNA).  Pleasure Decl. at ¶ 29.  There are individuals that are able to rapidly acetylate certain drugs, and individuals that more slowly acetylate certain drugs, as well as still further individuals that lie somewhere in between those two extremes.  *Id.*; *see also* Ex. 12 (Sabbagh 2008) at 1–14.  As of 2011, the prior art disclosed that different phenotypes (i.e. physical manifestations) and genotypes (i.e. genetic makeups) "may account for some of the observed variations in pharmacokinetics, drug toxicity and susceptibility to cancers in different populations."  Ex. 11, Pande 2004 at 24.  "[C]linical consequences of the acetylation polymorphism can be severe if standard drug doses are applied, exposing patients to an increased risk of adverse drug reactions or a lack of therapeutic efficacy."  Ex. 12, Sabbagh 2008 at 2.

10

There are several methods that can be used to determine the speed at which a particular individual metabolizes a drug (i.e., the individual's acetylator status), including enzymatic assays and genotyping. Pleasure Decl. at ¶ 30.  In an enzymatic assay, subjects are given a substrate (or drug to be studied) and the subsequent level of that drug present in the body is measured at a defined time.  *Id.* at ¶ 31.  Many different substrates can be used in an enzymatic assay.  In genotyping, a subject's NAT2 genotype is evaluated by sequencing the individual's DNA to determine what NAT2 alleles are present.  *Id.* at ¶ 32.  It has been reported in the art, for example, that the presence of the *4 (wild-type) allele defines a NAT2 genotype as a rapid acetylator, whereas the NAT2*5B allele is a marker for a slow acetylator.  *Id.*  This does not necessarily mean, however, that an individual with a *4(wild-type) allele will be a fast acetylator for all substrates and an individual with the NAT2*5B allele will be a slow acetylator for all substrates.

## III.   LEGAL STANDARDS

"A finding of noninfringement requires a two-step analytical approach. First, the claims of the patent must be construed to determine their scope.  Second, a determination must be made as to whether the properly construed claims read on the accused device." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).  Claim construction is a matter of law.  *Id.*  "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence

of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Id.* While the specification is "the single best guide to the meaning of a disputed term," the Court may "also consider the prosecution history and any relevant extrinsic evidence." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1374 (Fed. Cir. 2014).

Indefiniteness is also a question of law and "[t]he inquiry 'trains on the understanding of a skilled artisan at the time of the patent application.'" *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1260 (Fed. Cir. 2014) (citing *Nautilus*, 572 U.S. at 911). While issues of indefiniteness and claim construction are intertwined, courts in this district "routinely decline to address indefiniteness arguments in claim construction because they are potentially dispositive, require a high burden of proof, and may more profitably be considered in connection with patent validity." *E.g.*, *Fresenius Kabi USA, LLC v. Fera Pharms., LLC*, 2016 WL 5109142, at *9 (D.N.J. Sep. 20, 2016).[5]

A patent claim is invalid for indefiniteness under 35 U.S.C. § 112 if the claim, "read in light of the specification delineating the patent, and the prosecution history, fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. The primary purpose of the definiteness

---

[5] Whether this dispute should be decided at the claim construction stage has been briefed in a joint dispute letter that is currently pending before this Court. D.I. 52.

requirement is "to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* at 909 (citation and alteration omitted). Thus, "[t]he claims . . . must provide objective boundaries for those of skill in the art." *Interval Licensing*, 766 F.3d at 1371. "[E]xtrinsic evidence may play a significant role in the indefiniteness analysis. Indeed, definiteness is evaluated from the perspective of a person of skill; requires a determination of whether such a skilled person would understand the scope of the claim when it is read in light of the specification; and is evaluated in light of knowledge extant in the art at the time the patent application is filed[.]" *Dasso Int'l, Inc. v. Moso N. Am., Inc.*, 2023 WL 5349374, at *8 (D. Del. Aug. 21, 2023) (quoting concurrence from *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 809 F.3d 1223, 1225 (Fed. Cir. 2015)).

## IV.    ARGUMENT

### A.    All asserted claims of the '088 patent are indefinite and invalid.

The terms "solvate" and/or "complex," which both appear (directly or indirectly[6]) in each claim of the '088 patent, are each indefinite for independent reasons. Thus, if the Court agrees with Defendants that either term is indefinite, all asserted claims of the '088 patent are invalid.

---

[6] If an independent claim is invalid as indefinite, all dependent claims are indefinite "because they incorporate the elements of [the] independent claim." *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1378 (Fed. Cir. 2013).

### 1. "Solvate"

| TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|------|-----------------------------------|-----------------------------------|
| "solvate" | Not indefinite. *Plain and ordinary meaning*: The compound formed by the interaction of a solvent and a solute. | Indefinite |

### a. The term "solvate," which appears in each asserted claim of the '088 patent, is indefinite.

The claims and specification of the '088 patent use the term "solvate" in a way that is different from the way a POSA would understand the term. Moreover, the claims use the term inconsistently such that a POSA would not be able to ascertain their scope.

The '088 patent discloses that the claimed dimer impurity can exist in three different forms, or a combination of the three: "a salt, solvate, **or** complex, **or a combination thereof**." '088 patent at Claim 1 (emphasis added). Thus, the claim language distinguishes a solvate from a complex, and also from a salt. *Id.*; *see also id.* at 1:45–46; 5:59–60; 7:35–36 (specification similarly stating that the dimer can be in the form of a salt, solvate **or** complex). As another example, the specification explains that the dimer can exist as a mixture of the three distinct forms, where "the solvent, salt, and complex ratio is about 1:1:1." *Id.* at 5:28–32. In other words, the solvent (which gives rise to a solvate) is separate from the salt, which is separate from the complex. The specification never says that a "solvate" can also be a

14

"complex," or vice versa, but instead, repeatedly refers to "salt," "solvate," and "complex" as three independent and different forms that can exist alone or at the same time as one another.

Consistent with the specification, a POSA as of the priority date would understand that "complex" and "solvate" are unique terms, referring to different structures. Lepore Decl. at ¶ 34. For example, as discussed above, a POSA would have understood that a solvate was a crystalline compound associated with one or a small, fixed number of solvent molecules incorporated into the crystal structure, while a complex was generally understood to be a group of molecules that are held together through bonding with a metal atom. *Id.* at ¶¶ 30, 35. Once again, the two are distinct structures from each other.

Despite this, claims 3–5 use "solvate" and "complex" interchangeably and inconsistently:

> 3. The 3,4-diaminopyridine dimer of claim 1, wherein the ==**complex**== comprises a ==**monohydrate**== group.

> 4. The 3,4-diaminopyridine dimer of claim 1, wherein the **solvate** comprises a **monomethanolate** group.

> 5. The 3,4-diaminopyridine dimer of claim 1, wherein salt comprises a sulfate, the **solvate** comprises a ==**monohydrate**==, and the ==**complex**== comprises a **monomethanolate**.

For example, claim 4 states that the solvate is a monomethanolate, while claim 5 states that the **complex** is a monomethanolate. Lepore Decl. at ¶¶ 99–103; *see also* '088 patent at 4:66–5:13 (stating that "[i]n some aspects, the solvate comprises a

15

monomethanolate"). Likewise, claim 3 refers to a monohydrate being a "complex," whereas claim 5 calls the monohydrate a "solvate." The claims are at odds with each other and also with the patent specification that makes clear that solvates and complexes are distinct structures. Where some claims "use [a] term . . . in a manner that is inconsistent with the use of that same term in [other] claims" and, thus, "the intrinsic evidence presents a POSA with irreconcilably inconsistent information," "the Patent[] fail[s] to inform a POSA of the invention's scope with reasonable certainty." *TVnGO Ltd. v. LG Elecs., Inc.*, No. CV-1810238-RMB-KMW, 2020 WL 1899781, at *3–4 (D.N.J. Apr. 17, 2020), *aff'd sub nom. TvnGO Ltd. (BVI) v. LG Elecs. Inc.*, 861 F. App'x 453 (Fed. Cir. 2021) (finding claims indefinite where the claims and specification were internally inconsistent). That is precisely the situation here. Claim 1 (like the specification as a whole) specifies that the dimer is in the form of a solvate *or* complex, (*i.e.*, two different potential forms), but subsequent dependent claims (and dependent claims include the limitations of the independent claim they refer to) use the terms inconsistently. The result is an internally inconsistent claim with an undefined scope.

Rather than try to explain how the term "solvate" relates to, and differs from, a "complex," Plaintiffs double down, stating that their expert will explain that "a skilled artisan would understand that a 'solvate' would be an example of a 'complex' in which a solvent is associated with a solute." D.I. at 6 (Plaintiffs' statements in

the Joint Claim Construction and Prehearing Statement).  Plaintiffs included no intrinsic support for this statement, which is unsurprising given that it is inconsistent with the patent's repeated statements that solvates and complexes are distinct forms of the dimer.  But extrinsic evidence cannot "be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." *Bell Atl. Network Servs. v. Covad Commc'ns Grp.*, 262 F.3d 1258, 1269 (Fed. Cir. 2001).  Thus, Plaintiffs' expert's statements that a POSA would understand solvate and complex to have overlapping scope is incorrect and cannot be relied upon here.

The '088 patent specification introduces yet additional uncertainty to the scope of the term "solvate."  Specifically, it is unclear from the '088 patent whether "solvate" includes alcoholates, or if they are considered distinct forms.  In one place, the specification states that in addition to a monomethanolate, the "solvate form can comprise other alcoholates."  '088 patent at 5:12–13.  A POSA reading this disclosure would understand that an alcoholate is generally any *crystalline* form in which the associating molecule is an alcohol, of which monomethanolate is one example.  Lepore Decl. at ¶¶ 65–72.  However, a different portion of the specification distinguishes between "solvates and "alcoholates," saying that "degradation of 3,4-[DAP] can be evidenced by the presence of a dimer of 3,4-[DAP] or a dimer having certain salt, *solvate **or** alcoholate* derivatives."  '088 patent

at 4:1–4.  Thus, in contrast to the patent's disclosure noted earlier, the patent here distinguishes between solvates and alcoholates and considers them to be distinct forms.  A POSA would not expect the patentee to distinguish between the forms if the patentee considered alcoholates to simply be examples of solvates. And of course, the claims themselves use the term "solvate" in inconsistent ways:  claim 4 says the monomethanolate is a solvate, but claim 5 calls it a complex.  '088 patent at Claim 4, 5.  Based on the conflicting statements throughout the patent, a POSA would be unable to determine what exactly the claims encompass when referring to a "solvate."

> **b.    Plaintiffs' proposed construction does not cure the indefiniteness of the term "solvate" and is itself indefinite.**

Plaintiffs propose that "solvate" be construed as: "The compound formed by the interaction of a solvent and a solute."  Unfortunately, this proposed construction does not resolve the indefiniteness problem.  Plaintiffs' definition does nothing to cure the inconsistent use of the term, which leaves the scope of the claims in doubt. *See IQASR LLC v. Wendt Corp.*, 825 F. App'x 900 (Fed. Cir. 2020) ("even if a claim term's definition can be reduced to words, the claim is still indefinite if a [POSA] cannot translate the definition into meaningfully precise claim scope").

Specifically, Plaintiffs' construction fails to remedy the interchangeable and inconsistent use of "solvate" and "complex" and "alcoholate" / "monomethanolate."

For example, claim 5 claims that the "complex comprises a monomethanolate." A monomethanolate is a compound formed by the interaction of a solvent (methanol) and a solute (in this case, amifampridine). Thus, Plaintiffs' construction for "solvate" would capture structures that are elsewhere in the claims defined as a "complex." Similarly, Plaintiffs' construction of "solvate" would capture "alcoholates," and as discussed above, the specification distinguishes the two in certain instances. Thus, employing Plaintiffs' construction results in the same internal inconsistencies in the patent's use of the term.[7]

### 2. "Complex"

| TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|
| "complex" | Not indefinite. *Plain and ordinary meaning*: Any free-standing structure in which the interacting species maintain a weak association by means of noncovalent bonds, thereby retaining much of their individual chemical entities. | Indefinite |

### a. The term "complex," which appears in each asserted claim of the '088 patent, is indefinite.

The term "complex," which appears (directly or indirectly) in each claim, renders the asserted claims indefinite for several of the reasons discussed above with

---

[7] As we will explain in further detail in response to Plaintiffs' arguments, Plaintiffs' construction would cause the claims to be invalid for written description and enablement, as there is no support for the construction in the patent.

respect to "solvate." For example, claims 1 and 3–5 contain internal inconsistencies, which prevent a POSA from ascertaining the scope of the claims. *Supra* § IV.A.1.a; Lepore Decl. at ¶¶ 99–103. Specifically, while the specification and claim 1 make clear that "complex" and "solvate" are separate forms of the claimed dimer, claims 3–5 use the term "complex" interchangeably with "solvate." *Id.* As of the priority date of the '088 patent, a POSA would not have used these terms interchangeably, and thus, would not be able to interpret the meaning of "complex" with reasonable certainty without further guidance, which the '088 patent specification does not provide. Lepore Decl. at ¶¶ 123–124.

Based on Plaintiffs' statements in the Joint Claim Construction and Prehearing Statement, their proposed solution appears to involve further mingling the scope of "solvate" and "complex." Plaintiffs state that "complex" can refer to a "solvent-solute complex," and thus, a "skilled artisan would understand that a 'solvate' would be an example of a 'complex' in which a solvent is associated with a solute." D.I. 58 at 6. Plaintiffs' position fails to save the claims.

For the same reasons discussed above, Plaintiffs' proposed definition is simply inconsistent with the intrinsic record which repeatedly distinguishes complexes and solvates, explaining that the claimed dimer can be a "complex" ___or___ "solvate." *Supra* § IV.A.1.a. The patent further clarifies that each of these forms is distinct, explaining that in some embodiments "the solvent, salt, and complex ratio

is about 1:1:1, while in other embodiments the ratio is about 1:1:1.5." '088 patent at 5:28–32; Lepore Decl. at ¶¶ 74–75. In other words, the solvent (which gives rise to a solvate) is separate from the salt, which is separate from the complex. Claim 1 also makes this point by claiming a "salt, solvate, *or* complex." '088 patent at Claim 1.

Figure 4 of the '088 patent (annotated below) further illustrates the problem. The Figure provides an "atomic displacement ellipsoid" of the various components discussed above:



FIG. 4

'088 patent at FIG. 4. Here, the claimed dimer, "DDP," (i.e., the claimed impurity) is shown in pink. The DDP together with water (blue) would form a monohydrate (which plaintiffs also call a solvate); the DDP together with sulphate (green) would form a salt; and the DDP together with methanol (yellow) would form a monomethanolate (also a solvate). Lepore Decl. at ¶ 76. It is unclear which components represent the "complex." *Id.* at ¶¶ 76–83. There are no interpretations

that would be acceptable to the POSA.  *Id.*  If the association of the DDP with either the yellow, blue, or green elements are referred to as a "complex," the result would conflict with the patent's distinction of a complex, solvate, and salt.  *Id.*

For example, if the complex is defined to be the DDP and either water or monomethanolate (pink and blue or pink and yellow), that would violate the idea that a solvate (a broader term for hydrate, and inclusive of a monomethanolate) is separate from a complex.  *Id.*

Plaintiffs' disclosure that interprets "complex" to encompass a "solvent-solute complex" is also in tension with the patent itself and cannot be correct.  There is nothing in the patent that suggests the claimed "complex" can be a "solvent-solute complex."  As Dr. Lepore explains, a POSA would understand a "solvent-solute complex" to exist as a transient state and *in solution*, and there is no disclosure of this in the specification.  Lepore Decl. at ¶ 127.  In fact, the '088 patent never mentions the DDP being in solution at all.  *Id.*

Moreover, the '088 patent certainly does not mention solvent-solute complexes by name.  As discussed above, and acknowledged by Plaintiffs' own reference, there is a primary definition for the term "complex": a group of molecules that are held together through bonding with a metal atom.  Ex. 7 (Munowitz) at A116.  When a POSA intends a different meaning, "complex" is used in conjunction

with a modifying term, for example: "solvent-solute complex," "molecular complex," or "enzyme-substrate complex." Lepore Decl. at ¶¶ 38, 120.

The '088 patent does not use any modifiers, and thus a POSA would expect that the primary definition applies. After reviewing the patent specification, however, a POSA would understand that the primary definition cannot apply in the context of the '088 patent because the structures claimed and described do not contain a metal atom. Lepore Decl. at ¶ 119. In trying to resolve this ambiguity and uncertainty, a POSA would look to alternative definitions of "complex" in view of the intrinsic record. *Id.* at ¶¶ 119–121. In doing so, a POSA would understand that the term "complex" does not encompass solvent-solute complexes because the claimed complex is not in solution. *Id.* at ¶¶ 124–127. And as noted, the patent distinguishes complexes from solvates (which involve interactions between solvent and solute and exist only in the solid, crystalline state). While a POSA would exclude solvent-solute complexes based on the specification, a POSA would not be able to determine the meaning of complex with reasonable certainty.

### b. Plaintiffs' proposed construction does not cure the indefiniteness of "complex" and is itself indefinite

As discussed above, Plaintiffs argue that "complex" should be construed as: "Any free-standing structure in which the interacting species maintain a weak association by means of noncovalent bonds, thereby retaining much of their individual chemical entities." In doing so, they do not cite support in the patent, but

say that their expert will attest to the fact that this is how a POSA would understand the term.  But their expert's testimony is unsupported by, and inconsistent with, the patent[8] and "is less reliable for the purposes of claim construction than the patent and its prosecution history."  *Cipher Pharms. Inc. v. Actavis Labs. FL, Inc.*, 99 F. Supp. 3d 508, 512 (D.N.J. 2015).

Specifically, Plaintiffs offer a construction so broad that it would essentially encompass any two molecules associated by covalent bonds (*see generally* Lepore Decl. at ¶ 120), which is inconsistent with how a POSA would read the intrinsic record.  For example, while the specification fails to articulate what a "complex" is within the context of the '088 patent, it does clarify that "complex" is distinct from "solvate."  *Supra* § IV.A.1.a.  Plaintiffs admittedly construe "complex" broadly enough that it would encompass a "solvate" (D.I. 58 at 6), which is at odds with these disclosures.  Lepore Decl. at ¶¶ 123–127.  Similarly, Plaintiffs themselves admit that their construction encompasses solvent-solute complexes (D.I. 58 at 6). This, however, is also at odds with the patent's disclosures.  *Id.*  Again, while the patent fails to explain what types of complexes are included, the specification would

---

[8] As we will explain in further detail in response to Plaintiffs arguments, Plaintiffs' construction would cause the claims to be invalid for written description and enablement, as there is no support for the construction in the patent.

lead a POSA to exclude solvent-solute complexes, given that the dimer is not in solution and solutions are never mentioned by the '088 patent. *Id.*

Ultimately, Plaintiffs cannot escape the fact that the claims of the '088 patent use "solvate" and "complex" interchangeably (and inconsistently) despite claim 1 and the specification making clear that each term refers to a different and unique form of the claimed dimer.

### B. All asserted claims of the Method of Treatment Patents are invalid for indefiniteness under 35 U.S.C. § 112.

### 1. Each asserted claim of the Method of Treatment Patents is rendered indefinite by a term that refers to a patient being a "slow acetylator" or having "slow alleles" or "fast alleles."

Each claim of the Method of Treatment Patents is indefinite because of their inclusion (directly or indirectly) of one of the following terms[9]:

| Claim Term | Asserted Claim(s) |
|---|---|
| "a human patient who is a N-acetyl transferase 2 (NAT2) slow acetylator" | '128A patent: claims 1–20 |
| "a human patient who is a NAT2 slow acetylator" | '128A patent: claims 21–28 |
| "wherein the patient has two NAT2 slow alleles" | '128B patent: claims 1–17 |
| "each NAT2 slow allele is a NAT2*5, *6, *7, or *14 allele" | '128B patent: claims 1–17 |
| "a human patient diagnosed with LEMS having two N-acetyl transferase 2 (NAT2) fast alleles" | '331 patent: claims 1–18 |

---

[9] If an independent claim is indefinite, all dependent claims are indefinite. *Ibormeith IP*, 732 F.3d at 1378.

| Claim Term | Asserted Claim(s) |
|---|---|
| "a human patient diagnosed with LEMS having two NAT2 fast alleles" | '331 patent: claims 19–28 |
| "a human patient diagnosed with LEMS having two N-acetyl transferase 2 (NAT2) slow alleles" | '332 patent: claims 1–17 |
| "a human patient diagnosed with LEMS having two NAT2 slow alleles" | '332 patent: claims 18–26 |

The Method of Treatment Patents share a common specification, and have slight differences in how their claims are drafted. But importantly, for all of these related patents, a POSA would not be able to determine with reasonable certainty whether a patient is a NAT2 slow acetylator[10], both because (1) different testing methods yield different results, which can materially impact the boundaries of the claim; and (2) relatedly, "slow" and "fast" are terms of degree that are not adequately defined. Thus, each of the above terms are indefinite.

### a. Different testing methods yield different acetylation status results and the patent does not specify which method to use.

Each claim of the Method of Treatment patents is indefinite because there are multiple methods for evaluating whether someone is a slow acetylator, and these

---

[10] While some of the claims refer to fast or slow "alleles" rather than a "slow acetylator," these limitations are indefinite for the same reasons. Pleasure Decl. at ¶¶ 89–98. A POSA would still consider the results of a phenotyping assay, which as discussed, could differ depending on the substrate used. *Id.* A POSA would understand that alleles make proteins, e.g., the NAT2 enzyme, which may be characterized as fast, slow, or intermediate, depending on the substrate used. *Id.*

methods can yield different results in a way that would impact the question of infringement. "[A] claim may be invalid as indefinite when (1) different known methods exist for calculating a claimed parameter, (2) nothing in the record suggests using one method in particular, and (3) application of the different methods result in materially different outcomes for the claim's scope." *Saso Golf, Inc. v. Nike, Inc.*, 843 F. App'x 291, 296 (Fed. Cir. 2021) (affirming the district court's finding of indefiniteness where "[t]he scope of the claim [at issue] depends on [certain] measurements" but there was "[n]othing in the record indicat[ing] that an artisan would know" how to make those measurements).

In *Pacific Coast Building Prods., Inc. v. CertainTeed Gypsum, Inc.*, the Federal Circuit affirmed a finding of indefiniteness where the patent "fail[ed] to provide guidance to a skilled artisan for how to measure [one claim limitation] with reasonable certainty." 816 F. App'x 454, 459 (Fed. Cir. 2020). The court explained that "[w]hile the claims recite a particular value [of a limitation], the claims and specification fail to explain what the value represents or how to consistently and reproducibly measure" the limitation. *Id.*; *see also Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620, 634 (Fed. Cir. 2015) (affirming finding of indefiniteness where "multiple methods" existed "leading to different results without guidance in the patent or the prosecution history as to which method should be used").

Similarly here, multiple methods exist and the patent fails to explain how to "consistently and reproducibly" determine someone's acetylation status within the meaning of the claims.

### i. Several methods exist for assessing one's acetylation status, each potentially yielding different results.

As of the priority date of the Method of Treatment Patents, there were various known methods for determining the speed at which a patient completed the acetylation process, thus removing a foreign substance from their body. Pleasure Decl. at ¶ 60. For example, different genotyping and phenotyping assays were available. *Id.* These methods have significant differences and for each of these methods, different substrates can be used. *Id.*

Importantly, a particular patient's acetylation status (e.g., slow, intermediate, or fast) can differ depending on the particular assay and/or substrate that is used. Pleasure Decl. at ¶¶ 60–78. In other words, "application of the different methods result in materially different outcomes for the claim's scope." *Saso Golf*, 843 F. App'x at 296. An individual with a particular genotype could be considered a slow acetylator when one substrate is used in an enzymatic assay, but that same individual could be considered a fast acetylator when different substrate is used in the same assay, rendering a different infringement result depending on the method used. Pleasure Decl. at ¶¶ 65–68.

This is illustrated by the contemporaneous scientific literature. For example, Dr. Pleasure cites a scientific paper by Fukunaga. As Dr. Pleasure explains, the NAT2 *5, *6, and *7 alleles are typically considered to be "slow" alleles and are associated with slow acetylation. Pleasure Decl. at ¶¶ 67–68. Figures 1D–F (annotated below) illustrate that the values of these *typically* slow alleles can vary significantly depending on the substrate used. *Id.* Here, eight different substrates were analyzed, each yielding different results:



Ex. 17, Fukunaga at Figure 1.

For example, as shown in Figure 1F, if DDP is used as the substrate in the enzymatic assay, a person with a NAT2 *7 allele would be labeled as a fast acetylator, even though that individual has the NAT2 *7 allele, which is typically considered to be a "slow" allele. Pleasure Decl. at ¶ 68. If INH is used as a substrate in that same individual, the person with a NAT2 *7 allele would be considered a "slow" acetylator. *Id.* Thus, the substrate that is used in an enzymatic assay has important implications in determining an individual's acetylation status. A single

individual can be deemed a fast acetylator when DDP is used as a substrate in an enzymatic assay and a slow acetylator when INH is used. *Id.*

To add to the uncertainty, genetic sequencing can alternatively be used to determine whether someone is considered a fast or slow acetylator, again yielding potentially different results. Specifically, if genetic sequencing is used to determine an individual's acetylation status, the results could differ depending on how many and which nucleotide positions are being sequenced. Pleasure Decl. at ¶¶ 70–75. Given the large number of genetic mutations and alleles that could potentially be involved, the prior art taught that genotyping methods focusing on a "limited number of 'indicator' mutations, thought to be … predictive of acetylator status" can "wrongly type different alleles as the same and may lead to misclassification of genotypes and deduced phenotypes." *Id.* at ¶ 73; Ex. 12 (Sabbagh 2008) at 2.

And, regardless of the alleles identified, there are several factors that can influence the level of NAT2 allele expression, which in turn affects the patient's acetylation rate. Pleasure Decl. at ¶ 61. In other words, the genotype (genetic sequence) may not always agree with the acetylator phenotype (the actual expression that is manifested in the patient). The data above demonstrating different values for different substrates even with a supposedly "slow" allele are examples of this. *Id.* at 61–68. Thus, if a POSA is sequencing at just one or two positions, the POSA could

conclude that a particular individual has a "fast" allele even though that same individual is actually a slow acetylator (i.e. a slow acetylator "phenotype").

Even to the extent certain NAT2 alleles are considered "slow" alleles generally, a POSA would not know whether these alleles correspond to "slow" acetylators for amifampridine specifically. *Id.* at 75. Again, alleles may be slow for some substrates, but not others. *Id.*

The existence of "different known methods" to determine a patient's acetylator status that can all yield different results and "materially different outcomes of the claim's scope" mean that two of the three factors for indefiniteness are met. *Saso Golf*, 843 F. App'x at 296. The third is also met because the patents do not suggest "using one method in particular." *Id.*

### ii.    The patents do not suggest using one method and substrate in particular.

Despite the existence of multiple methods that result in materially different outcomes, nothing in the record suggests which one method in particular to use. The specification highlights the many different ways that a patient's acetylation status can be determined. The patent describes various different methods for determining an individual's NAT2 acetylator phenotype, including enzymatic assays using several different substrates and genotype sequencing. For example, the specification discusses assays completed using caffeine ('128A patent at 11:41–57, Example 15a), amifampridine (*id.* at 11:66–12:17), or isoniazid (*id.* at Example 15). Pleasure Decl.

31

at ¶ 80. Moreover, the patent explains that "administration of sulfamethazine, hydralazine, phenytoin, sulfadiazine, and procainamide can be used to determine a person's acetylation status." '128a patent at 63:22–25.

The specification also discloses various ways that one can evaluate a subject's NAT2 genotype or alleles. Pleasure Decl. at ¶ 81. For example, the specification states that "[i]n some or any embodiments, a subject's NAT polymorphism genotype is determined by screening a subject's NAT2 gene using one or both of the following molecular probes: C282T and T341C." '128A patent at 12:26–29. Alternatively, "[i]n some or any embodiments, the subject's NAT2 gene is examined for one of the following four SNPs *5, *6, *7, and *14." *Id.* at 12:32–34.

While the patents mention several examples of substrates that have been used in enzymatic assays (including an amifampridine-based enzymatic assay), the patents do not specify which method or substrate should be used to determine the acetylation phenotype of an individual—i.e., to determine where on the spectrum of acetylation activity the patient actually appears. The patents never state that amifampridine (or any of the other substrates mentioned) is a preferred substrate, let alone explain how amifampridine compares to many other possible substrates disclosed, and a POSA would be aware of many others too. Pleasure Decl. at ¶ 83. Moreover, a POSA as of the priority date would not have assumed that amifampridine, an active drug substance, should be used in initial testing to

determine a patient's acetylation status, because there would be unknown toxicity concerns.  *Id.*   In other words, a POSA would not want to give a patient amifampridine without first knowing how quickly that patient would be able to process the substance.  *Id.*  And the patent claims do not specify any substrate.

Given that (1) there are multiple testing methods that can be used to determine acetylation status, and many different substrates that can be used in those methods; (2) the Method of Treatment Patents do not suggest one method in particular; and (3) application of these different methods and use of different substrates in those methods result in materially different outcomes for the claim's scope, each asserted claim of the Method of Treatment Patents is, by law, indefinite.

### b.    "Slow" and "fast" are terms of degree that are not adequately defined in the specification

The asserted claims are indefinite for a second (and related) reason.  The terms "slow" and "fast" are relative terms that are undefined in the claims and specification and can vary depending on how the results of a particular assay are interpreted.  *Id.* at ¶¶ 76–78.

"Although terms of degree are not inherently indefinite, the patent must provide some standard for measuring that degree such that the claim language provides enough certainty to one of skill in the art when read in the context of the invention."  *GE Lighting Solutions, LLC v. Light of Am., Inc.*, 663 F. App'x 938, 940 (Fed. Cir. 2016) (internal citations and quotations omitted) (finding the term of

degree "Elongated" indefinite because the patent "fail[ed]" to "provide [] additional information in the form of 'objective boundaries'"). "Thus, for the asserted claims to be definite, the patent must provide that additional information in the form of objective boundaries." *Id.*

*Interval Licensing LLC* is instructive. 766 F.3d at 1370–71. There, the Federal Circuit held that the phrase "unobtrusive manner" was indefinite because it was "highly subjective and, on its face, provides little guidance to one of skill in the art." *Id.* at 1371. The court explained that "it is not enough" for a patent to "identify *some standard* for measuring the scope" because "[t]he Supreme Court [has] explained that a patent does not satisfy the definiteness requirement . . . merely because a court can ascribe *some* meaning to a patent's claims." *Id.* (internal quotation omitted). In finding the term indefinite, the court reasoned that "[t]he patents contemplate a variety of stimuli that could impact different users in different ways" and "a term of degree fails to provide sufficient notice of its scope if it depends on the unpredictable vagaries of any one person's opinion." *Id.* (internal quotation omitted).

Like the patent in *Interval Licensing*, the Method of Treatment Patents provide little guidance to one of skill in the art on what qualifies as "fast" or "slow." The specification provides that under the caffeine test disclosed in Example 15a, "[i]n general[,] fast acetylators have a [metabolite] ratio of greater than about 0.2, in

another example between about 0.2 to about 0.3, in another example greater than 0.3, in another example between about 0.3 and 0.5." '128A patent at 63:58–61. Thus, if the metabolite ratio is .25, a POSA would not be able to determine with reasonable certainty whether the person being tested is a fast or intermediate acetylator, which would depend on the specific cut-off being used in the assay. Pleasure Decl. at ¶ 76. Moreover, while the specification states that "a slow acetylator is a person who has a [metabolite] ratio of about 0.2 or less" in the Example 15a caffeine test, the prior art has reported a different cut-off for other caffeine tests. *Id.* at ¶ 77. There is similar uncertainty in the patent's discussion of an assay using amifampridine. There, the specification explains that a fast acetylator:

> has an $AUC_{0\text{-}inf}$ ratio of N-(4-aminopyridin-3-yl)acetamide/3,4-DAP of ***greater than about 20***. In some or any embodiments, a slow acetylator has a ratio … of ***less than about 20***. In some or any embodiments, the fast acetylator has an $AUC_{0\text{-}inf}$ ratio … of ***greater than about 25***. In some or any embodiments, a slow acetylator has a ratio … of ***less than about 15***. In some or any embodiments, the fast acetylator has an $AUC_{0\text{-}inf}$ ratio … of ***greater than about 30***. In some or any embodiments, a slow acetylator has a ratio … of ***less than about 10***.

'128A patent at 11:66–12:17.

Thus, the patents fail to provide a standard for measuring whether an individual acetylation speed is "fast" or "slow." Pleasure Decl. at ¶ 84. The claims do not use the terms "fast" and "slow" as being relative to some other measure, nor

do they provide a sliding scale of metabolism speed. Instead, the claims use terms that demand certainty—either someone is a slow acetylator or they are not—without providing a definition. The Method of Treatment Patents do not identify where the cut off is and there is no such accepted cut off in the art. *Id.* Indeed, based on the prior art literature, a POSA would understand that there are also "intermediate" acetylators, and there is no bright line rule for which category an individual falls within. This problem is intensified by the fact (as noted above) that several different testing methods and substrates can be used to measure acetylation speed, each of which give differing results. *Id.* The Method of Treatment Patents provide no guidance on these issues and are therefore invalid as indefinite.

Rather, the patents are vague to give Plaintiffs the ability to decide what the claims mean only once they are trying to allege infringement of a particular product. But that is exactly what the patent laws try to avoid. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation" (or invalidity—here indefiniteness) "and another to find infringement.").

### 2.    Plaintiffs' proposed constructions do not cure the indefiniteness of the terms and are themselves indefinite.

Plaintiffs have proposed alternative constructions for each term at issue:

| Indefinite Term | Plaintiffs' Proposed Construction |
|---|---|
| "a human patient who is a N-acetyl transferase 2 (NAT2) slow | *Plain and ordinary meaning:* "a human patient who metabolizes 3,4-DAP slowly" |

36

| Indefinite Term | Plaintiffs' Proposed Construction |
|---|---|
| acetylator" / "a human patient who is a NAT2 slow acetylator" | |
| "wherein the patient has two NAT2 slow alleles" | *Plain and ordinary meaning:* "wherein the patient has two NAT2 slow alleles" |
| "each NAT2 slow allele is a NAT2*5, *6, *7, or *14 allele" | *Plain and ordinary meaning:* "each NAT2 slow allele is a NAT2*5, *6, *7, or *14 allele" |
| "a human patient diagnosed with LEMS having two N-acetyl transferase 2 (NAT2) fast alleles" / "a human patient diagnosed with LEMS having two NAT2 fast alleles" | *Plain and ordinary meaning:* "a human patient diagnosed with LEMS having two N-acetyl transferase 2 (NAT2) fast alleles" / "a human patient diagnosed with LEMS having two NAT2 fast alleles" |
| "a human patient diagnosed with LEMS having two N-acetyl transferase 2 (NAT2) slow alleles" / "a human patient diagnosed with LEMS having two NAT2 slow alleles" | *Plain and ordinary meaning:* "a human patient diagnosed with LEMS having two N-acetyl transferase 2 (NAT2) slow alleles" / "a human patient diagnosed with LEMS having two NAT2 slow alleles" |

With respect to the terms requiring a patient who is a "slow acetylator," Plaintiffs have proposed limiting the term to refer to "a human patient **who metabolizes 3,4-DAP [i.e. amifampridine]** slowly." However, as discussed above, the specification describes various methods for determining whether a patient is a "slow acetylator," including the use of different phenotyping and genotyping methods, as well as various substrates that are suitable for use in those methods, e.g., caffeine, isoniazid, sulfamethazine, hydralazine, phenytoin, sulfadiazine, procainamide, and amifampridine. *See, e.g.*, '128a patent at 63:22–25, Examples 15 and 15a. There is nothing in the intrinsic record that supports limiting the claims to 3,4-DAP (amifampridine) specifically. Amifampridine is never described in the

specification as a preferred substrate over other drugs that can be used to determine a patient's acetylation status. Nor is there any experimental data relating to the use of amifampridine to determine whether a patient is a "slow acetylator," including in any of the examples. Most importantly, the claims themselves do not limit the patient's acetylator status to 3,4-DAP (i.e. amifampridine). Plaintiffs' proposed construction represents an improper attempt to narrow the claim by re-writing it in a way they wished they had written it before the Patent Office. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("a court may not import limitations . . . into the claims").

Even if Plaintiffs' proposed construction of "slow acetylator" was proper (it is not), their construction does not cure the indefiniteness of the claim terms. Indeed, "even if a claim term's definition can be reduced to words, the claim is still indefinite if a [POSA] cannot translate the definition into meaningfully precise claim scope." *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900 (Fed. Cir. 2020).

Like the terms themselves, Plaintiffs' proposals are vague and ambiguous as to what methods should be used to determine whether a human patient metabolizes amifampridine slowly (or what "slowly" means with reference to some standard). Pleasure Decl. at ¶ 87. As discussed, the results of the acetylator phenotype may not always agree with the genotype. This is the case even if amifampridine specifically is used as the substrate in a phenotyping assay, given that the results of genetic

sequencing could differ depending on which nucleotide positions are sequenced. *Id.* For example, the specification identifies various genetic mutations that can be tested to determine whether a person is a slow acetylator, e.g., mutations at nucleotide positions 192, 282, 341, 434, 481, 590, 813, 845, and 857, as well as different NAT2 alleles that can be markers for slow acetylation, such as NAT2 *5, *6, *7, and *14. As explained by Dr. Pleasure, if a POSA is sequencing at just one or two positions, the POSA could conclude that a particular individual has a "fast" allele even though that same individual has a slow acetylator phenotype according to an amifampridine-based enzymatic assay. *Id.* Thus, a POSA could reach different conclusions depending on which method is used. *Id.* Plaintiffs' proposals do not resolve these issues, nor could they without improperly importing limitations into the claims.

As for the remaining disputed terms in the method of treatment patents, Plaintiffs' proposed constructions simply parrot the claim language, and are indefinite for the same reasons.

## V.    CONCLUSION

For the above reasons, the asserted claims of the '088 patent and the Method of Treatment Patents are indefinite and Plaintiffs' constructions should be rejected.

Dated:  December 22, 2023

*OF COUNSEL:*

W. Blake Coblentz (*pro hac vice*)
Aaron S. Lukas (*pro hac vice*)
**Cozen O'Connor**
1200 19th Street, NW
Washington, DC 20036
(202) 912-4800
wcoblentz@cozen.com
alukas@cozen.com

Keri L. Schaubert (*pro hac vice*)
**Cozen O'Connor**
3WTC 175 Greenwich St., 55th Fl.
New York, NY 10007
(212) 509-9400
kschaubert@cozen.com

*s/ Eric I. Abraham*
Eric I. Abraham
William P. Murtha
**Hill Wallack LLP**
21 Roszel Rd., P.O. Box 5226
Princeton, NJ 08543
(609) 924-0808
eabraham@hillwallack.com
wmurtha@hillwallack.com
*Attorneys for Defendants Annora Pharma Private Limited, Grace Consulting Services, Inc., Hetero Labs Limited, and Hetero USA, Inc.*

*OF COUNSEL:*

Keith D. Parr (*pro hac vice*)
Nina Vachhani (*pro hac vice*)
Jacob C. Britz (*pro hac vice*)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0700

Zhibin Li
Locke Lord LLP
Brookfield Place, 200 Vesey Street
New York, New York 10281
646-217-7897

*s/ James S. Richter*
James S. Richter
**MIDLIGE RICHTER, LLC**
645 Martinsville Road
Basking Ridge, New Jersey 07920
(908) 626-0622
Email: jrichter@midlige-richter.com

*Attorneys for Defendants Lupin Limited and Lupin Pharmaceuticals, Inc.*

*OF COUNSEL:*

George C. Lombardi
Ivan M. Poullaos
Alison M. King

*s/ Douglas R. Weider*
Douglas R. Weider
**Greenberg Traurig LLP**

Brian L. O'Gara
WINSTON & STRAWN LLP
35 W. Wacker Drive Chicago, IL 60601-9703
(312) 558-5600

500 Campus Drive
Suite 400
Florham Park, NJ 07932
(973) 360-7900
weiderd@gtlaw.com

*Attorneys for Defendants*
*Teva Pharmaceuticals, Inc., and Teva*
*Pharmaceuticals USA, Inc*